Filed: 5/16/2025 3:50 PM
Clerk
Marion County, Indiana

# INDIANA COMMERCIAL COURT

| | | |
|---|---|---|
| STATE OF INDIANA | ) | IN THE MARION SUPERIOR COURT 1 |
| | ) SS: | |
| COUNTY OF MARION | ) | CAUSE NO.: 49D01-2312-PL-049785 |

|  |  |
|---|---|
| SOLERA PEARL, LLC, | ) |
| SOLERA EXPO, LLC, and | ) |
| ASPEN INVESTMENT GROUP, LLC | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| PEARL CAPITAL MANAGEMENT, LLC, | ) |
| TEGETHOFF DEVELOPMENT, LLC and | ) |
| JEFFREY J. TEGETHOFF, individually, | ) |
| | ) |
| Defendants. | ) |

## FIRST AMENDED COMPLAINT FOR DAMAGES, TREBLE DAMAGES, PUNITIVE DAMAGES AND FOR REMOVAL OF MANAGER

Plaintiffs Solera Pearl, LLC ("Solera"), Solera Expo, LLC ("Expo") and Aspen Investment Group, LLC ("Aspen"), for their Complaint against Pearl Capital Management, LLC, Tegethoff Development, LLC, and Jeffrey J. Tegethoff, state:

## I.      INTRODUCTION

Plaintiffs Solera, Expo, and Aspen find themselves facing every investor's worst nightmare. Despite careful diligence by their principals – Shawn and Jeff Bush – Plaintiffs find themselves owed millions of dollars that cannot be found and holding investments that do not match the representations made to them by Defendants Pearl Capital Management, LLC ("PCM"), Tegethoff Development, LLC ("TD"), and Jeffrey J. Tegethoff.

Plaintiffs Solera and Aspen are still owed over $1.3 million from the sale of two mixed-use developments in the St. Louis and Kansas City areas that occurred over three years ago. Plaintiffs have learned that all of the other limited partners in the deal received their payouts over

two years ago. But despite numerous promises that, in essence, "the check is in the mail" from PCM, TD, and Mr. Tegethoff, they have not been paid, aside from a single partial payment made pursuant to a Court order following a sanctions hearing. Nor can Defendants offer any plausible explanation as to what has happened to the money or why Solera and Aspen have not been paid.

Meanwhile, Plaintiff Expo was induced by PCM, TD, and Mr. Tegethoff to enter into another investment in the St. Louis area. Expo was told that Expo and PCM would each invest $3.25 million into a mixed-use, multi-family housing development in St. Louis, in exchange for a 30% direct ownership interest in the project. But the financial information provided to Expo since investing in PCM Forest Park does not add up. Plaintiffs have learned that PCM, TD, and Mr. Tegethoff's representation that the PCM/Expo investment entity would hold a 30% ownership interest in the project was false. Worse, financial records show that Plaintiffs' $3.25 million investment into PCM Forest Park was immediately misappropriated by Defendants and used for other purposes entirely unrelated to the Expo at Forest Park project. To date, Mr. Tegethoff has stymied all of Expo's efforts to ascertain the exact nature of the investment and there has been no accounting as to where Expo's $3.25 million investment went.

No investor wants to file a lawsuit like this. But Plaintiffs are out of options. They are owed millions, have been prevented from reviewing the necessary books and records to determine the status of their investment, and have had their fill of Mr. Tegethoff's' excuses. They now seek to recover the funds they are owed and to remove Mr. Tegethoff and PCM as manager of their remaining investment entity.

## II.   FACTS COMMON TO ALL ALLEGATIONS

### A. PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff Solera is an Indiana limited liability company with a principal office

2

located at 12085 Leighton Court, Carmel, Indiana 46032.

2. Plaintiff Expo is an Indiana limited liability company with a principal office located at 12085 Leighton Court, Carmel, Indiana 46032.

3. Plaintiff Aspen is an Indiana limited liability company with a principal office located at 12085 Leighton Court, Carmel, Indiana 46032.

4. Defendant PCM is an Indiana limited liability company with a principal office located at 6801 Lake Plaza Drive, Suite A-103, Indianapolis, Indiana 46220.

5. Defendant Tegethoff Development, LLC ("TD") is a Missouri limited liability company with its principal offices located at 7253 Watson Rd, Suite 1073, Saint Louis, MO 63119-4401 and 6801 Lake Plaza Drive, A-103, Indianapolis, IN 46220-4061.

6. At the time of the acts in question, Defendant Tegethoff was a resident and citizen of Indiana. He now resides in Missouri.

7. At all relevant times, PCM was doing business in Marion County, Indiana.

8. At all relevant times, TD was doing business in Marion County, Indiana.

9. Mr. Tegethoff is the president of both PCM and TD and, upon information and belief, their sole member.

10. At all relevant times, Mr. Tegethoff was doing business in Marion County, Indiana.

11. Both the Operating Agreement and Limited Partnership Agreement, discussed below, are governed by Indiana law and the Limited Partnership Agreement sets forth Indiana courts as the proper jurisdiction and venue for any disputes arising from it.

12. This Court has subject matter jurisdiction over this cause of action.

13. This Court has personal jurisdiction over PCM, TD, and Mr. Tegethoff.

14. Venue is proper in this Court pursuant to Indiana Trial Rule 75(A)(1)(4) and Rule

3

2 of the Indiana Commercial Court Rules because this matter involves disputes between business entities as to their activities and relations among them.

15. Plaintiffs' Commercial Court Identifying Notice is filed contemporaneously with this Complaint as required by Indiana Commercial Court Rule 4.

**B. FORMATION AND INVESTMENT IN PEARL CAPITAL MANAGEMENT JOINT VENTURE FUND I, L.P.**

16. Together, Shawn N. Bush and Jeffrey N. Bush own and operate Solera Equity Capital, LLC and Hickory Investors, LLC. These entities manage Solera, Expo, and Aspen on behalf of numerous investors, including the Bushes themselves. The Bushes have more than sixty years of combined experience in accounting, commercial real estate and asset management.

17. In November 2018, the Bushes were introduced to Mr. Tegethoff by a mutual acquaintance. Mr. Tegethoff subsequently solicited their interest in investing in Pearl Capital Management Joint Venture Fund I, L.P. ("PCM JV Fund" or "the Fund"). As part of Mr. Tegethoff's solicitation, the Bushes were provided with the PCM JV Fund Confidential Private Placement Memorandum, a copy of which is attached as **Exhibit A**.

18. The Private Placement Memorandum solicited an investment of $10 million for 200 units of limited partner interests in PCM JV Fund. The Fund offered investors capital appreciation by investing in the construction and operation of multi-family and/or mixed-use buildings in Chesterfield, Missouri (the "Wildhorse Project") and Lee's Summit, Missouri ("the "Summit Project").

19. The Bushes had not invested with Mr. Tegethoff, TD, or PCM previously.

20. Following several meetings with Mr. Tegethoff and a tour of the Wildhorse and Lee's Summit Projects, on or about February 4, 2019, Aspen purchased 18 units of PCM JV Fund for a total purchase price of $900,000.

4

21. On or about February 12, 2019, Solera purchased 31 units of PCM JV Fund for a total purchase price of $1,550,000.

22. The Fund had other limited partners in addition to Aspen and Solera.

23. As part of their investment, Solera and Aspen entered into the Limited Partnership Agreement of Pearl Capital Management Joint Venture Fund I, L.P. ("JV Fund Partnership Agreement"). A true and accurate copy of the JV Fund Partnership Agreement is attached hereto as **Exhibit B**.

24.

25.

26. The JV Fund Partnership Agreement further provided that within ninety (90) days of the sale, exchange, redemption, transfer, or other disposition of any real estate owned by PCM JV Fund, all distributable cash would be paid to the limited partners who had invested in the Fund. (Ex. B, JV Fund Partnership Agreement, p. 16, § 8.2).

### C. PCM FAILS TO PAY ASPEN AND SOLERA THE PROCEEDS FROM THE WILDHORSE PROJECT

27. Upon information and belief, the Summit Project was sold in or about May 2022.

28. Solera and Aspen, along with the other limited partners, received distributions from the sale of the Summit Project between August 2022 and October 2022.

29. Upon information and belief, the Wildhorse Project was sold in or about September

2021.

30.     As with the sale of the Lee's Summit Project, this sale triggered PCM's duty to pay Solera and Aspen pursuant to Article 8 of the JV Fund Partnership Agreement.

31.     Upon information and belief, the other Fund limited partners received distributions from the sale of the Wildhorse Project in January 2023.

32.     Solera and Aspen, however, did not receive a distribution from the sale of the Wildhorse Project.

33.     They did, however, receive a Schedule K-1 federal tax form that reflected a distribution having been made to Solera and Aspen from the sale of the Wildhorse Project.

34.     When Mr. Bush questioned Mr. Tegethoff as to why Solera and Aspen had received K-1s, but no actual distribution, Mr. Tegethoff told Mr. Bush that the Wildhorse Project sale had not been completed and distributions were delayed because accountants and attorneys were working to backdate any sale to the 2022 tax year.

35.     Mr. Tegethoff never disclosed that other Fund limited partners had been paid from the Wildhorse sale.

### D. THE EXCHANGE FOR SIF UNITS

36.     After the Plaintiffs filed lawsuit, the Defendants – for the first time on March 11, 2024 – disclosed that Solera and Aspen's interest in the Wildhorse project had been exchanged for ownership interests in the Great Lakes Capital Stabilized Income Fund I, LLC ("GLC SIF").

37.     The ownership interest in GLC SIF was tracked by the issuance of membership units ("the SIF Units") which the Defendants contend would remain in GLC SIF's continued possession for reinvestment into further real estate projects – an investment framework not previously discussed with the Plaintiffs – or until the owner of each SIF Unit requested its

6

redemption.

38.    In support of that contention, the Defendants provided the Agreement to Make Contribution which shows that on September 7, 2021, Tegethoff, on behalf of PCM, directed half of the proceeds of the Wildhorse project, approximately $3,947,807.21, to be exchanged for SIF Units of an equivalent value. A true and accurate copy of that Agreement to Make Contribution is attached hereto as **Exhibit C**. (Exh. C, p 2).

39.    The Agreement further directs the SIF Units to be split evenly between two entities: (1) 50% to the AET 2021 Irrevocable Trust, dated June 18, 2021, and (2) 50% to Pearl Capital Management, LLC. (*Id*. at p. 6).

40.    In a recently discovered Amended Pearl Direction dated November 8, 2021, Tegethoff directed the 50% originally owed to AET 2021 Irrevocable Trust, dated June 18, 2021 to instead be diverted to Tegethoff Development, LLC. A true and accurate copy of the Amended Pearl Direction is attached hereto as **Exhibit D**. (Exh. D, p. 1).

41.    A year later, on November 11, 2022, a ledger of GLC SIF shows that Tegethoff then directed GLC SIF to redeem the outstanding balance of SIF Units attributable to both Pearl Capital Management, LLC and Tegethoff Development, LLC – leaving both entities with a near zero balance of SIF Units. A true and accurate copy of that GLC SIF ledger is attached hereto as **Exhibit E**. (Exh. E, p. 1).

42.    As a direct result of the foregoing, it appears that all SIF Units – and thus any proceeds – attributable to the sale of the Wildhorse project have been redeemed by Tegethoff, Pearl Capital Management, LLC and/or Tegethoff Development, LLC as of November 8, 2022.

43.    Defendants received over $2 million on or about November 8, 2022 from their redemption of the SIF units – including those received in exchange for Solera and Aspen's interest in Wildhorse.

44.    Defendants, however, did not pay Aspen and Solera from the proceeds of the SIF redemption. Instead, they misappropriated the funds and used it for other purposes, including transferring money to TD for other investments and making personal distributions to Mr. Tegethoff.

**E. DEFENDANTS LIE TO PLAINTIFFS IN AN EFFORT TO CONCEAL THEIR MISAPPROPRIATION OF FUNDS**

45.    Acting on behalf of Solera and Aspen, Shawn Bush began inquiring again as to the status of Solera and Aspen's payments in August 2023. At the time, Mr. Bush was still unaware that the other Fund limited partners had been paid almost a year previously.

46.    During a series of text and email exchanges with Mr. Tegethoff through August, September, and October 2023, Mr. Tegethoff repeatedly assured Mr. Bush that Solera and Aspen were going to be paid, or in some cases, that the wire transfer payments had actually been sent. At no point did he inform Mr. Bush that Solera and Aspen were the only two limited partners who had not been paid or offer any explanation as to why payment had not been made.

47.    Instead, Mr. Tegethoff offered a litany of excuses as to why payment had not been made or received. He made these excuses to prevent Mr. Bush from taking any further action on behalf of Solera and Aspen regarding their missing payments. These excuses include, but are not limited to:

- **September 20, 2023**: Mr. Tegethoff texted Mr. Bush that he had received a wire transfer of funds owed to PCM JV Fund from the sale of the Fund's assets and would be making payment from those funds to Solera and Aspen.

- **October 2, 2023**: Mr. Tegethoff texted Mr. Bush that "extra proceeds had been found" in the Fund and that the payments to Solera and Aspen needed to be recalculated.

- **October 6, 2023**: In response to repeated inquiries from Mr. Bush regarding the status of the wire transfer of Fund payments to Aspen and Solera, Mr. Tegethoff texted: "I'm sorting through a batch wire issue on the phone with bank right now. All 12 wires in the batch haven't sent and I don't have my fob to re-enter but working through to get phone wires approved, which I'm not set up for. I'm working on it. Stay tuned."

- **October 20, 2023**: In response to repeated inquiries from Mr. Bush regarding the missing payments, Mr. Tegethoff texted: "All wires have been setup. I'll forward confirmation numbers when I receive them."

- **October 23, 2023**: In response to Mr. Bush's text that Mr. Bush had still not received any wire transfers, Mr. Tegethoff texted: "One of four wires I did today has been received. I will follow up on the other three. Two of those are aspen and solera."

- **October 24, 2023**: Mr. Tegethoff texted: "I have forgotten [sic] about you. I'm headed to the bank to get your wires done. Yours are last two. Because of size I needed to make sure the right people were there for sign off. This is not an account that was setup for activity like this. As you know, yours are the largest of the group. Give me a bit and I'll call you. My goal is to get you the money first, then the docs, tax return, etc…and then we can sit down and I'll share more about what transpired if you care to hear it. I'll touch base in a bit.

- **October 25, 2023**: Mr. Tegethoff texted: "Your wires are getting done today. Just let me get through today and get you the funds then we can connect on everything. I apologize for the delay."

- **October 26, 2023**: Mr. Tegethoff texted: "I don't think they will get done today. I can focus on it tomorrow. I've been dealing with this family issue this week and have some time back free tomorrow. Almost 100% of my time has been handling this personal issue. I know it is frustrating but your money will be there and the documents you requested. We received redacted tax returns and bank statements today. I'm going to review tonight and send to you ASAP.

48.     The foregoing statements (the "Representations") were false when made, a fact Mr.

Tegethoff knew at the time he made them.

49.     They were each made with the intent that Mr. Bush rely upon them and refrain from

taking any action to recover the missing monies owed to Solera and Aspen and from investigating the disposition of those funds.

50.     Mr. Bush did rely on those statements, which has resulted in injury to both Solera and Aspen.

51.     Although Solera and Aspen have received Court ordered payments during this litigation, they are still owed over $1.3 million from the sale of Summit and Wildhorse.

52.     Nor have Solera and Aspen received access to the Fund's books and records despite multiple written requests to PCM and PCM's counsel.

### F.   THE FOREST PARK INVESTMENT

56.     Shortly after securing Solera and Aspen as investors in PCM JV Fund, Mr. Tegethoff and PCM approached Shawn Bush about another investment Expo at Forest Park (the "Forest Park Project").

57.     This investment was for the construction and operation of a large mixed-use multi-family housing complex in St. Louis, Missouri.

58.     During discussions between Mr. Tegethoff and Mr. Bush, Mr. Tegethoff represented that the investment structure would be for both PCM and Expo to invest $2,800,000 into PCM-Expo at Forest Park, LLC ("PCM Forest Park"), for which they would obtain a 50% membership interest in PCM Forest Park.

59.     PCM Forest Park, in turn, would be the general partner for Expo at Forest Park, LLC and own 30% of the interests of that entity.  Mr. Tegethoff further represented that PCM Forest Park would be entitled to a promoted interest after payment of a preferred return on the capital invested by the general partner and the institutional limited partner. In other words, Expo was told that PCM Forest Park would have significant upside on profits after the initial 10%

preferred return to both PCM Forest Park and the institutional investor.

60.     Expo agreed to the deal and initially invested $2,800,000 into the project in November 2019.

61.     Mr. Tegethoff then informed Mr. Bush that the investment needed to be increased. Expo invested an additional $450,000 into the project in December 2019, bringing its total investment to $3,250,000.

62.     Mr. Tegethoff represented to Mr. Bush that PCM had also invested $3,250,000 into the project and that PCM Forest Park controlled 30% of Expo at Forest Park, LLC, the entity that owned the Forest Park Project land and buildings.

63.     Expo and PCM also entered into the Operating Agreement of PCM-Expo at Forest Park, LLC ("Operating Agreement"), a true and accurate copy of which is attached as **Exhibit F**.

64.     Exhibit A to the Operating Agreement reflects that PCM and Expo each hold 50% of the PCM Forest Park membership interests. (Ex. C, Operating Agreement, p. 25 ).

65.     PCM is designated as PCM Forest Park's Manager. (Id. at p. 7, §4.2).

66.     As Manager, PCM has "complete authority, power, and discretion to manage and control the business, affairs, and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business." (Id. at p. 6, §4.1).

67.     Pursuant to Article 3 of the Operating Agreement, PCM Forest Park is required to maintain a variety of books and records at its principal office and submit annual reports.

68.     Pursuant to Section 3.2, all PCM Forest Park members have the right to inspect the company's books and records during normal business hours. (Id. at p. 6, §3.2).

   **G. EXPO DISCOVERS THAT PCM FOREST PARK'S OWNERSHIP STRUCTURE HAS BEEN MISREPRESENTED**

11

68.     Mr. Bush emailed Mr. Tegethoff on April 15, 2022, requesting documentation of the ownership breakdown for PCM-Expo at Forest Park, LLC.  After initially telling Mr. Bush that he personally held a 5% ownership interest, Mr. Tegethoff backtracked and informed Mr. Bush that FREP IV held a 70% ownership interest in the project and PCM Forest Park held the remaining 30% interest.

69.     Despite Mr. Tegethoff's representations that PCM and Expo would have equal, fifty percent interests in PCM Forest Park based on their purported equal contribution to the entity and that PCM Forest Park would hold a 30% stake in Expo at Forest Park, LLC, on or about October 27, 2023, Mr. Bush received an Excel spreadsheet from Mr. Tegethoff that provided information for the PCM Forest Park project.

70.     A tab titled "Distribution Schedule" set forth the ownership interest in Expo at Forest Park, LLC. A copy of that tab of the spreadsheet is attached as **Exhibit G**.

71.     Based on Mr. Tegethoff's representations, Mr. Bush expected the Distribution Schedule to reflect a 70% ownership interest for the institutional investor – FREP IV – and a 30% ownership interest for PCM Forest Park.

72.     Instead, the Distribution Schedule reflected FREP IV holding a 90.3% ownership interest in the project, Mr. Tegethoff personally holding a 1.46% ownership interest in the project, and an unknown entity – "Expo Dev Group for Expo GP" – holding the remaining 8.24% interest.

73.     Since this initial discovery, Plaintiffs have learned, upon information and belief, that the "Expo Dev Group" entity is wholly owned by the AGM Irrevocable Trust dated October 17, 2011 and managed by Michael Bailey, who is also the ultimate manager of the FREP IV entity.

74.     It appears that the actual ownership structure of Expo at Forest Park, LLC is as follows:

12

a. (1) 90.3% owned by Expo at Forest Park Investment Group, LLC, which is 100% owned by Fireside Real Estate Partners IV LP, elsewhere referred to as FREP IV, LLC; and

b. (2) 9.7% owned by Expo at Forest Park, GP, LLC whose members consist of:

    i. Tegethoff Development, LLC, owning 15% of Expo at Forest Park GP, LLC and therefore 1.46% of the project; and

    ii. Expo Dev Group, LLC, which is wholly owned by the AGM Irrevocable Trust dated October 17, 2011 and managed by Michael Bailey, owning the remaining 85% of Expo at Forest Park GP, LLC and therefore 8.24% of the project.

75. This ownership structure is directly contrary to the Defendants' prior representations about the ownership structure and does not appear to incorporate Expo's $3.25 million dollar investment into PCM-Expo at Forest Park, LLC.

76. In an effort to clear up the discrepancies regarding the actual ownership structure of Expo at Forest Park, LLC – and to determine what Expo's actual investment interest in the project is – Mr. Bush has repeatedly requested access to PCM Forest Park's books and records to ascertain the actual ownership structure of both PCM Forest Park and Expo at Forest Park, LLC. PCM has repeatedly failed to make PCM Forest Park's books and records available for inspection.

**H. DEFENDANTS HAVE CONVERTED EXPO'S $3.25 MILLION INVESTMENT**

77. Since the litigation has begun, Plaintiffs have learned that, upon receipt of Expo's investment, PCM Forest Park immediately transferred Expo's funds to PCM.

78. PCM then transferred $1.55 million to Tegethoff's personal bank account.

79. PCM spent an additional $1.3 million on expenses, most of which were entirely unrelated to the Expo at Forest Park Project.

80. Expo at Forest Park was unaware that its investment funds were being used by Defendants for other purposes and certainly did not authorize it.

13

## COUNT I – BREACH OF CONTRACT BY PCM (JV FUND PARTNERSHIP AGREEMENT)

81.     Solera, Expo, and Aspen incorporate by reference the foregoing paragraphs as if fully restated herein.

82.     The JV Fund Partnership Agreement is a valid and enforceable contract entered into by PCM, Solera, and Aspen among others.

83.     Article VIII of the JV Fund Partnership Agreement requires PCM to make distributions to the limited members upon disposition of PCM JV Fund's assets.

84.     The JV Fund Partnership Agreement further places on PCM a "fiduciary duty to conduct the affairs of Partnership in the best interests of the Partnership, including the safekeeping of all Partnership funds and assets and the use thereof for the benefit of the Partnership." (Ex. B, JV Fund Partnership Agreement, p. 11, § 5.1).

85.     PCM breached the JV Fund Partnership Agreement by failing to pay Solera and Aspen pursuant to Article VIII of the JV Fund Partnership Agreement.

86.     PCM breached the JV Fund Partnership Agreement by failing to carry out its fiduciary duty to safe keep all partnership funds and assets and use them for the benefit of the partnership.

87.     PCM breached the JV Fund Partnership Agreement by failing to make available the Fund's books and records for examination by Solera and Aspen.

88.     As a direct and proximate result of each individual breach of the JV Fund Partnership Agreement by PCM, Solera and Aspen have incurred damages in an amount to be proven at trial.

WHEREFORE, Solera and Aspen, by counsel, seek entry of judgment in their favor and against PCM on this Count I, awarding them damages in an amount to be proven at trial, plus costs

14

and expenses, and prejudgment and post-judgment interest, attorneys' fees, and all other appropriate relief.

### COUNT II – FRAUD (PCM, TD, & TEGETHOFF)

89. Solera, Expo, and Aspen incorporate by reference the foregoing paragraphs as if fully restated herein.

90. Throughout September and October 2023, Jeff Tegethoff – acting individually and on behalf of both TD and PCM – made the Representations to Shawn Bush.

91. The Representations were all false when made and Mr. Tegethoff knew they were false.

92. The Representations were each made with the intent that Mr. Bush rely upon them and refrain from taking any action to recover the missing monies owed to Solera and Aspen and from investigating the disposition of those funds.

93. Mr. Bush did rely on the Representations, which has resulted in injury to both Solera and Aspen.

WHEREFORE, Solera and Aspen, by counsel, seek entry of judgment in their favor and against PCM, TD and Mr. Tegethoff on this Count II, awarding them damages in an amount to be proven at trial, plus costs and expenses, punitive damages, and prejudgment and post-judgment interest, attorneys' fees, and all other appropriate relief.

### COUNT III – FRAUD IN THE INDUCEMENT (PCM, TD, AND TEGETHOFF)

94. Solera, Expo, and Aspen incorporate by reference the foregoing paragraphs as if fully restated herein.

95. At the time PCM and Mr. Tegethoff induced Expo to enter into the PCM Forest Park Operating Agreement, PCM and Mr. Tegethoff knew that Expo would not be acquiring a direct or indirect 15% interest in Expo at Forest Park, LLC and that PCM Forest Park would not

15

be the general partner of Expo at Forest Park, LLC.

96.     At the time PCM and Mr. Tegethoff induced Expo to enter into the PCM Forest Park Operating Agreement, PCM and Mr. Tegethoff knew that PCM could not – and would not – contribute $3.25 million in capital to the entity.

97.     Upon information and belief, as of the Execution Date, PCM and Mr. Tegethoff falsely represented that they had contributed $3.25 million to PCM Forest Park to invest in the Forest Park project.

98.     Upon information and belief, as of the Execution Date, PCM and Mr. Tegethoff falsely represented that PCM Forest Park would acquire a 30% ownership interest in Expo at Forest Park, LLC.

99.     Upon information and belief, in his April 16, 2022 email to Mr. Bush, Mr. Tegethoff falsely represented that PCM Forest Park held a 30% ownership interest in Expo at Forest Park, LLC.

100.    Mr. Tegethoff made this false representation to induce Mr. Bush to rely upon it and refrain from investigating further the actual ownership structure of Expo at Forest Park, LLC, which Mr. Tegethoff had originally falsely represented to induce Expo to enter into the Operating Agreement.

101.    Expo reasonably relied upon the actions and representations of PCM and Mr. Tegethoff (including their silence when a duty to speak existed) in executing the Operating Agreement, as set forth above in this Complaint, to the detriment of Expo.

102.    As a direct and proximate result of PCM and Mr. Tegethoff's actions and representations (including their silence when a duty to speak existed), Expo incurred damages in an amount to be proven at trial.

103.     As a direct and proximate result of PCM and Mr. Tegethoff's actions and representations (including their silence when a duty to speak existed), Expo is entitled to rescission of the Operating Agreement.

104.     Under Indiana law, Expo may elect its remedy for being fraudulently induced into signing the Operating Agreement and need not do so at this time.

105.     Because PCM and Mr. Tegethoff's conduct was intentional, Expo is entitled to both compensatory and punitive damages in an amount to be proven at trial.

WHEREFORE, Expo, by counsel, seeks entry of judgment in its favor and against PCM and Mr. Tegethoff on this Count III, by either (1) affirming the contract, awarding Expo damages in an amount to be proven at trial, plus costs and expenses, and prejudgment and post-judgment interest, attorneys' fees, and all other appropriate relief; or (2) rescinding the Operating Agreement, declaring it unenforceable against Expo, and using the Court's equitable powers to put Expo in the position it would have been in but for the fraudulent misrepresentations that induced it to enter into the Operating Agreement, including but not limited to, refunding Expo its principal investment, awarding it the returns it would have made on a similar non-fraudulent investment, awarding Expo its costs and attorneys' fees incurred in this litigation and all other just and proper relief.

**COUNT IV – BREACH OF CONTRACT BY PCM (PCM FOREST PARK OPERATING AGREEMENT)**

106.     Solera, Expo, and Aspen incorporate by reference the foregoing paragraphs as if fully restated herein.

107.     The PCM Forest Park Operating Agreement is a valid and enforceable contract entered into by PCM and Expo.

108.     Exhibit A to the Operating Agreement reflects that PCM and Expo each hold 50%

of the PCM Forest Park membership interests based on their purportedly equal capital contributions to the entity. (Ex. C, Operating Agreement, p. 25).

109.    Pursuant to Article 3 of the Operating Agreement, PCM Forest Park is required to maintain a variety of books and records at its principal office and submit annual reports.

110.    Pursuant to Section 3.2, all PCM Forest Park members have the right to inspect the company's books and records during normal business hours. (Id. at p. 6, §3.2).

111.    PCM breached the Operating Agreement by, among other things, failing to adhere to the respective membership interests set forth in the Operating Agreement.

112.    PCM breached the Operating Agreement by failing to make available PCM Forest Park's books and records for examination by Expo.

113.    As a direct and proximate result of each individual breach of the Operating Agreement by PCM, Expo has incurred damages in an amount to be proven at trial.

WHEREFORE, Expo, by counsel, seeks entry of judgment in its favor and against PCM on this Count IV, awarding it damages in an amount to be proven at trial, plus costs and expenses, and prejudgment and post-judgment interest, attorneys' fees, and all other appropriate relief.

### COUNT V – CONVERSION (PCM, TD, AND TEGETHOFF)

114.    Solera, Expo, and Aspen incorporate by reference the foregoing paragraphs as if fully restated herein.

115.    PCM, TD, and/or Mr. Tegethoff exercised unauthorized control, and continues to exercise unauthorized control, over $1.9 million of Solera and Aspen's funds when they refused to pay Solera and Aspen pursuant to the Partnership Agreement.

116.    PCM, TD, and/or Mr. Tegethoff exercised unauthorized control, and continue to exercise unauthorized control, over $3.25 million of Expo's funds when they misappropriated its

18

investment and used it for other purposes.

117.    Upon information and belief, PCM, TD, and Mr. Tegethoff had, and have, no intention of paying Solera and Aspen the funds they know are owed to them.

118.    Upon information and belief, PCM, TD, and Mr. Tegethoff have used both the $1.9 million initially owed from Wildhorse and the $3.25 million Expo investment to pay debts and obligations on other developments related to TD and Mr. Tegethoff or on personal debts of Mr. Tegethoff.

119.    PCM, TD, and Mr. Tegethoff were aware of the high probability that their control over Solera and Aspen's funds was unauthorized because they were aware that that they were contractually required to pay those funds to Solera and Aspen.

120.    As a direct and proximate result of PCM, TD, and Mr. Tegethoff's conversion of over $5 million of Solera, Expo, and Aspen's funds, Solera, Expo, and Aspen have incurred damages in an amount to be proven at trial.

121.    As a direct and proximate result of PCM, TD, and Mr. Tegethoff's conversion of Solera, Expo, and Aspen's funds, Solera, Expo, and Aspen are entitled to recover an amount not to exceed three (3) times their actual damages, the costs of the action, their reasonable attorneys' fees, their actual travel expenses, their direct and indirect expenses, and all other reasonable costs of collection.  Ind. Code § 34-24-3-1.

WHEREFORE, Solera, Expo, and Aspen, by counsel, seek entry of judgment in their favor and against PCM, TD, and Mr. Tegethoff on this Count V, awarding Solera, Expo, and Aspen damages in an amount not to exceed three (3) times their actual damages, the costs of the action, their reasonable attorneys' fees, their actual travel expenses, their direct and indirect expenses, all other reasonable costs of collection, prejudgment and post-judgment interest, and all other

appropriate relief.

## COUNT VI –  BREACH OF FIDUCIARY DUTY (PCM)

122.    Solera, Expo, and Aspen incorporate by reference the foregoing paragraphs as if fully restated herein.

123.    Solera, Aspen, and PCM entered into the JV Fund Partnership Agreement.

124.    Section 5.1 of the JV Fund Partnership Agreement provides that:

The General Partner shall be under a fiduciary duty to conduct the affairs of Partnership in the best interests of the Partnership, including the safekeeping of all Partnership funds and assets and the use thereof for the benefit of the Partnership.

(Ex. B, JV Fund Partnership Agreement, p. 11, § 5.1).

125.    PCM is the Fund's General Partner.

126.    By virtue of its status as a partner in the Fund and Section 5.1 of the JV Fund Partnership Agreement, PCM owes fiduciary duties to Solera and Aspen.

127.    By failing to pay Solera and Aspen the monies owed to them under the terms of the JV Fund Partnership Agreement, PCM has breached its fiduciary duties owed to Solera and Aspen.

128.    If PCM has used, or allowed to be used, any of the monies owed to Solera and Aspen for any other purpose, it has further breached its fiduciary duties owed to Solera and Aspen.

129.    Solera and Aspen have been harmed by PCM's fiduciary breaches.

WHEREFORE, Solera and Aspen, by counsel, seek entry of judgment in their favor and against PCM on this Count VI, awarding Solera and Aspen damages in an amount to be determined at trial, punitive damages, the costs of the action, their reasonable attorneys' fees, their actual travel expenses, their direct and indirect expenses, all other reasonable costs of collection, prejudgment and post-judgment interest, and all other appropriate relief.

## COUNT VII –  DECLARATORY JUDGMENT

130.    Solera, Expo, and Aspen incorporate by reference the foregoing paragraphs as if fully restated herein.

131.    Section 4.9 of the PCM Forest Park Operating Agreement provides that "the Manager may be removed at any time, with good cause, by the affirmative vote of a Majority-In-Interest of the Members (other than the Manager if the Manager is also a Member and the removal is for fraud or willful misconduct)."

132.    Section 4.5 of the PCM Forest Park Operating Agreement provides that the Manager may have liability to the company if the Manager incurs liability as "the result of fraud, deceit, gross negligence, or willful misconduct by the Manager."

133.    PCM is the Manager of PCM Forest Park.

134.    An actual controversy of a justiciable nature exists as to whether PCM has engaged in fraud or willful misconduct such that PCM can be removed as Manager of PCM Forest Park by virtue of a vote of a majority-in-interest of members not including PCM.

135.    An actual controversy of a justiciable nature exists as to whether PCM has engaged in fraud or willful misconduct such that PCM can be held liable for any liability incurred by PCM.

136.    Expo is entitled to a declaration that PCM has acted fraudulently and/or has engaged in willful misconduct such that Expo can remove PCM has PCM Forest Park's Manager and seek to recover any liability to PCM Forest Park caused by PCM's fraudulent or willful misconduct.

WHEREFORE, Expo, by counsel, seeks entry of judgment in its favor and against PCM on this Count VII, declaring that PCM has engaged in fraud and/or willful misconduct and that PCM can be removed as Manager under Section 4.9 of the Operating Agreement by Expo, and all other appropriate relief.

21

## COUNT VIII – ACCOUNTING

137.   Solera, Expo, and Aspen incorporate by reference the foregoing paragraphs as if fully restated herein.

138.   At all relevant times, PCM has served as the manager of both the PCM JV Fund and PCM Forest Park.

139.   As manager, PCM has handled all day-to-day decisions, financial affairs, and banking activities of both the Fund and PCM Forest Park.

140.   There are numerous complex accounts involved in connection with the analysis that will be required with respect to the rights of Solera, Aspen, and Expo, as alleged herein.

141.   Defendants have engaged or will engage in conduct that may result in the diversion or dissipation of assets or will obfuscate and withhold the PCM JV Fund, PCM Forest Park, and Expo at Forest Park, LLC's financial records so as to make it difficult for Solera, Aspen, and/or Expo to determine that which has occurred, including but not limited to the diversion, misapplication, or improper use of PCM JV Fund and/or PCM Forest Park's assets.

142.   In connection with a full and complete determination regarding the Defendants' conduct and the true financial status of Plaintiffs' rights, an equitable accounting will be required with respect to the financial affairs of all Defendants, as well as PCM JV Fund, PCM Forest Park, and Expo at Forest Park, LLC, for the period from February 1, 2019 to the date of determination in this matter.

WHEREFORE, Plaintiffs, by counsel, seek an order compelling the Defendants to provide any and all financial or other information which may be required to conduct a full, equitable accounting with respect to Defendants' financial affairs, as well as those of PCM JV Fund, PCM Forest Park, and Expo at Forest Park, LLC, for the period from February 1, 2019 to the date of

22

determination of this matter  and for all other just and proper relief.

## **JURY DEMAND**

Demand is hereby made that all claims that are triable to a jury, including those asserted

by the Plaintiffs, are tried to a jury.

Respectfully submitted,

*/s/Aaron D. Grant*
Aaron D. Grant, #25594-49

McCARTER & ENGLISH, LLP
10 East Main Street, Suite 200
Carmel, IN  46032
Phone  (317) 810-5500
Fax     (317) 602-1698

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 16, 2025, a copy of the foregoing was served on the following parties electronically by using the Court's IEFS System and U.S. Postal Service, pre-paid delivery for those parties not yet registered.


Timothy K. Ryan
Anthony Ridolfo
**Hackman Hulett LLP**
135 N. Pennsylvania Street
Suite 1610
Indianapolis, IN 46204
*Counsel for Defendants*


*/s/ Aaron D. Grant*
AARON D. GRANT, #25594-49

McCARTER & ENGLISH, LLP
10 East Main Street, Suite 200
Carmel, IN  46032
Phone  (317) 810-5500
Fax      (317) 602-1698
agrant@mccarter.com